NOTICE

Decision filed 06/12/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220266-U

NO. 5-22-0266

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 19-CF-257 |
| | ) | |
| PERCY FREEMAN, | ) | Honorable |
| | ) | Nancy S. Fahey, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the State's evidence was sufficient to prove the defendant guilty beyond a reasonable doubt, and where no argument for the defendant could possibly have arguable merit, the defendant's court-appointed appellate attorney is granted leave to withdraw as counsel, and the judgment of conviction is affirmed.

¶ 2    Following a bench trial in 2021, the defendant, Percy Freeman, was found guilty of intentional first degree murder, under an accountability theory. Subsequently, he was sentenced to imprisonment for 40 years. He now appeals from the judgment of conviction. His appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks arguable merit. On that basis, OSAD has filed with this court a motion to withdraw as counsel, along with a brief in support thereof. See *Anders v. California*, 386 U.S. 738 (1967). OSAD has served the defendant with a copy of its *Anders* motion and brief. In response, the

1

defendant has mailed to this court a letter that amounts to an objection to OSAD's *Anders* motion. Having examined OSAD's motion and brief, the defendant's written objection, and the entire record on appeal, this court agrees with OSAD that this appeal lacks merit. Accordingly, OSAD is granted leave to withdraw as counsel on appeal, and the judgment of conviction, entered by the circuit court of Vermilion County, is affirmed.

¶ 3                                     BACKGROUND

¶ 4       The defendant was charged with four counts of first degree murder—intentional (720 ILCS 5/9-1(a)(1) (West 2018)), knowing (*id.*), strong-probability (*id.* § 9-1(a)(2)), and felony (*id.* § 9-1(a)(3))—and one count of aggravated battery (*id.* § 12-3.05(c)). The predicate felony for felony murder was "robbery or mob action." The aggravating factor in the battery was that it occurred on a public way. Roosevelt Anderson was the named victim in each of the five counts. Anderson was shot once in the head, at very close range, resulting in his death. The State's theory of the case was that the defendant had worked in concert with Denzel Aldridge, Tariq Wilson, Tavares Mitchell, and Micah Hatcher, and that Aldridge was the one who had actually fired the shot.

¶ 5                                       Pretrial

¶ 6       At first, the public defender was appointed to represent the defendant in this case. However, every attorney in the public defender's office had a conflict of interest, and that office filed for the appointment of a conflicts public defender. A conflicts public defender was appointed as defense counsel. Through counsel, the defendant filed a notice of affirmative defense, stating that, at trial, he intended to rely on the defense of self-defense.

¶ 7       The case was placed on Judge Hall's docket. On December 23, 2020, shortly afterward, the defendant, by counsel, filed a motion for substitution of judge. In that motion, the defendant claimed that Judge Hall was so prejudiced against him that he could not receive a fair trial, and he

2

requested an automatic substitution. See 725 ILCS 5/114-5(a) (West 2020). The case was reassigned to Judge Fahey. No additional motion for substitution of judge was filed.

¶ 8                                    Pretrial: Waiver of Right to Trial by Jury

¶ 9    On January 11, 2021, the defendant, defense counsel, and two prosecutors appeared before the circuit court, Judge Fahey presiding. Defense counsel announced that the defendant would be waiving his right to a trial by jury and wanted a bench trial. The court proceeded to admonish the defendant regarding his jury-trial right.

¶ 10    Placed under oath, the defendant stated his name, and that he was 28 years old and lived in Chicago, where he had lived his whole life. He indicated that he had graduated from high school, that he could read and write the English language, that he was unaware of any disabilities, that he was not taking any medication, that he was thinking clearly and was able to make an important decision in this case, and that he had had sufficient time to discuss, with his attorney, the issue of waiving a jury trial.

¶ 11    The court asked the defendant to define jury trial, and the defendant answered, "12 people decide guilty or not guilty, give a verdict." The court then asked the defendant to define bench trial, and the defendant answered, "Leave that to the judge to decide the verdict." The court informed the defendant that he, at either type of trial, had the right to be present with his attorney and that he could cross-examine the State's witnesses, call his own witnesses, and present his own evidence, but could not be forced to testify against himself. "And the State has to prove the charges by [*sic*] beyond a reasonable doubt," the court stated. "Do you understand that concept?" The defendant answered, "Yes, yes." The court asked a second time whether the defendant understood that if he waived his right to a jury, the court would be "the one making the decision in your case," and the defendant answered in the affirmative.

3

¶ 12    Finally, the defendant indicated, in answer to the court's questions, that no one had promised him anything in order to persuade him to waive a jury trial, that no one had forced him to waive, that he was doing so freely and voluntarily, and that he did not have any questions about waiver. The defendant signed a jury waiver. The case was scheduled for bench trial.

¶ 13                                    Trial

¶ 14    In April 2021, the case was called for bench trial. Judge Fahey presided.

¶ 15    The crimes charged here were allegedly committed in a public-housing complex called Fair Oaks, located on the east side of Danville, Illinois. Maps and other evidence admitted at trial showed that Fair Oaks was a fairly small, rather compact housing complex. To the south, the Fair Oaks property was bounded by an east-west roadway named Fairchild Street. To the west, the property was bounded by a north-south roadway named Fowler Avenue. (It was in the southwestern quadrant of Fair Oaks that most of the key activity relevant to the alleged crimes occurred.) From the corner of Fairchild Street and Fowler Avenue, and moving east on Fairchild Street, one encountered Hubbard Lane, Redden Court, and Lewis Lane, in that order. Hubbard Lane, Redden Court, and Lewis Lane were very small streets, no larger than alleyways, and they extended straight north into the Fair Oaks property, but dead-ended at Fairchild Street. Clyman Lane was an east-west roadway in the northern reaches of Fair Oaks, which intersected Fowler Avenue and the three smaller streets, *i.e.*, Hubbard Lane, Redden Court, and Lewis Lane. A block-long rectangular parking lot was in the southwestern quadrant of Fair Oaks. The parking lot was approximately one-half block north of Fairchild Street, and it was between Hubbard Lane (to the west) and Redden Court (to the east). The housing in Fair Oaks consisted of approximately 26 long, narrow, two-story brick buildings. Each building contained five or six two-story apartments.

4

Sometimes, the fronts of these rectangular buildings faced one another, at a distance, thus forming courtyards, which were covered in grass.

¶ 16 At the bench trial, the State called several witnesses. However, the star "witness" turned out to be the Fair Oaks video surveillance system, the fruits of which will be described in detail *infra*.

¶ 17 Trial: The State's Case in Chief: Witnesses, and Other Non-Video Evidence

¶ 18 Jada Coley testified, for the State, that she knew the defendant, and that she recalled the day that a man named Roosevelt Anderson was shot in Fair Oaks. On that day, she was driving her burgundy-colored car. At one point, she was in her burgundy car along with a male cousin. Her car was stopped on Fairchild Street when the defendant asked Coley to take him to Casey's, on Main Street, where they had a special price on cigarettes. The defendant got into her car through a back door. Coley drove her cousin and the defendant to a parking lot on the Fair Oaks property. (That is, the parking lot that was one-half block north of Fairchild Street, between Hubbard Lane and Redden Court.) She stopped the car in the lot, without actually parking it. Coley's cousin got out of her car through the front passenger door and went to an apartment to fetch his identification card. However, the cousin did not soon return, and Coley finally decided to park her car. The defendant was sitting in the back seat. Then, the defendant, without saying anything to her, got out of her car. Coley did not know why the defendant had gotten out. Sometime thereafter, Coley herself got out of her burgundy car and "sat inside." Later, she heard that a person had been shot at Fair Oaks, and that a dead body was lying on the ground. Coley did not see the defendant for the remainder of the day.

¶ 19 Monty Schroeder testified for the State that he performed repairs and maintenance at the properties of the Vermilion County Housing Authority, including the Fair Oaks apartment

5

complex. On April 24, 2019, at approximately 1:45 p.m., he was at Fair Oaks, installing weather stripping on the back door of an apartment. He was standing very near the apartment's doorway when he saw a group of four men on a sidewalk. "[A]bout 20 feet" separated Schroeder from that group of four men. Three of these men "was [*sic*] kind of coming around" the other man, who was holding something close to his midsection, clutching it with both hands. Schroeder continued working. The man who was clutching something to his midsection "kept saying no." He said other things, and there was "some shouting coming from them," but all of that was unintelligible to Schroeder, due to his distance from the men and due to traffic noise from nearby Fairchild Street. Schroeder could not identify any of these four men. However, one of the men—not the one holding something close to his midsection—was wearing "a white hooded sweatshirt with red dots on it." As these four men were "messing around," another man, wearing "a long black coat," walked up to them, saw what was happening, and then walked away, out of Schroeder's sight.

¶ 20    According to Schroeder, the man wearing the white hooded sweatshirt then stood apart from the other three, who continued grappling. He saw this man "raise a gun up." One of those three men who were grappling—though not the man who held something to his midsection— stepped away. Schroeder, for fear of the gun, retreated into the apartment, locked the door, and called 911. He walked into a bathroom very near the backdoor, looked out the window, and described for the 911 operator all that he saw. At this point, Schroeder saw just three men—the man wearing the white hoodie, who held the gun, and two others, one of whom was "on" the other. The three men had moved onto the roadway by then. "[T]hey started hitting him in the back of the head with the gun." The three men together moved behind Schroeder's truck, blocking his view of them. Then, Schroeder heard a single, loud gunshot. He saw a man's legs lying in the roadway, but he could not see the rest of the man's body due to his truck. He also saw the two

6

men who were with the victim at the time of the gunshot "back up the sidewalk." The man who was lying in the roadway was the man who had been holding something close to his midsection and repeatedly saying "no." He never saw this man make any threatening moves.

¶ 21 Testimonial and other evidence at trial showed that Danville police arrived on the scene almost immediately after the shooting. A black man, later identified as Roosevelt Anderson, was lying supine in the middle of a roadway. Anderson was breathing but was nonresponsive. On his person, he carried a standard magazine of a firearm, full of what appeared to be live rounds of .45-caliber. When Anderson's body was lifted from the roadway, a spent shell casing—an RP brand .380-caliber—was observed in the roadway where his body had been. Also found at the scene, near Anderson's head, was a black Moto cell phone. Anderson later died.

¶ 22 Approximately two hours after Anderson was shot, Danville police executed a search warrant for the apartment at 911 Fowler Avenue in Fair Oaks. On the first floor of that apartment, inside a baby stroller, police found a pair of black athletic pants. Nearby, at the bottom of a plastic trash can, they found a black T-shirt and a distinctive white hoodie sweatshirt that was adorned, throughout, with small red-white-and-blue circular NASA logos. On the second floor of that apartment, in the bathroom, they found a SIG Sauer .380-caliber handgun. It was lying at the bottom of a small trash can, underneath a trash liner.

¶ 23 At trial, the parties stipulated that the shell casing found underneath Anderson's body had been fired from the SIG Sauer handgun found in the second-floor bathroom at 911 Fowler Avenue. There was a stipulation that this handgun had the DNA of Denzel Aldridge on it. There was also a stipulation that Anderson had died from a gunshot wound to the head. As for the Moto cell phone, the defendant later admitted that it was his.

7

¶ 24    Detective Patrick Carley, of the Danville Police Department, testified for the State. According to Detective Carley, he reviewed surveillance video that was recorded by cameras positioned throughout the Fair Oaks public-housing complex. All of that surveillance video was recorded on April 24, 2019, the date that Roosevelt Anderson was shot. From the surveillance video, Carley pulled video clips that showed activity relevant to the shooting. These video clips were admitted into evidence and published to the court. The clips were essentially in chronological order, and they will be discussed in that same manner here. The surveillance video was time-stamped, but it did not include audio.

¶ 25    Detective Carley further testified that prior to the day Anderson was shot, he had seen the defendant, as well as Denzel Aldridge, Tariq Wilson, Tavares Mitchell, and Micah Hatcher, on numerous occasions at the Fair Oaks complex. He had spoken with all five of them. All five either lived at Fair Oaks or would "hang out" there. When the prosecutor asked Carley whether all five would "hang out together," Carley answered in the affirmative. In regard to the defendant in particular, Carley had had fewer contacts with him—approximately "five to ten"—and had spoken with him on fewer occasions—"three or four"—than with those other four men.

¶ 26    Detective Carley identified a still photograph, captured from surveillance video on the day Anderson was shot. This photo was time-stamped 11:57:57 a.m. The source of the photo was a camera positioned a few yards north of Fairchild Street itself and pointed southward (and slightly to the west). Depicted in the photo was a portion of Fairchild Street—the two-lane, east-west roadway that forms the southern boundary of Fair Oaks. The photo showed Fairchild Street from its intersection with Redden Court (to the east, or left, in the photo) to the area approximately halfway between Redden Court and Hubbard Lane (to the west). The photo also showed the area on the opposite side (*i.e.*, the south side) of Fairchild Street, where Netta's convenience store was

8

located (at the upper-right of the photo) along with Netta's parking lot (to the east, or left, of Netta's itself).

¶ 27 In the photo, seven younger men were standing near one another on the sidewalk of Fairchild Street, on the Fair Oaks side (nearer the camera). Among those seven younger men were three whom Detective Carley identified as the defendant, Tariq Wilson, and Denzel Aldridge. The defendant was dressed in a black hoodie, black jeans, and dark shoes. Wilson was dressed in a black hoodie, faded blue jeans, and darker-colored shoes. Aldridge was dressed in a distinctive white hoodie with designs throughout, and ankle-length black athletic pants, with a pair of knee-length black gym shorts, with a white stripe down each side, over the longer athletic pants. Aldridge also wore white gym shoes. Of the seven young men present on the sidewalk, Aldridge was clearly the tallest. In the photo, the defendant and Wilson were only about six feet apart, facing one other.

¶ 28 Detective Carley testified that the defendant was on that portion of Fairchild Street, just milling about, for almost all of a 90-minute time period that day. Aldridge and Wilson, as well as Tavares Mitchell, were also milling about on that portion of Fairchild Street at the time.

¶ 29 Trial: The State's Case in Chief: Surveillance Video

¶ 30 Next, Detective Carley identified the first of many video clips that the State showed at trial. The first clip started at 12:33:32 p.m. It showed the same portion of Fairchild Street that was depicted in the photograph, with Netta's convenience store and parking lot on the opposite side (*i.e.*, the south side) of the street. At its start, the video showed a group of three men—the defendant, Tariq Wilson, and another man—standing very near one another on the sidewalk of Fairchild Street, on the Fair Oaks side of that street, nearer the camera. The defendant, Wilson, and the other man appeared to be talking to one another. At one point, the defendant appeared to

9

remove a cell phone from a pocket of his black hoodie and look at it for a few seconds. Six seconds into this video, another group of three men—including Denzel Aldridge, with his distinctive white hoodie—walked west (*i.e.*, to the right in the video) down the sidewalk on Fairchild Street, and they joined the defendant, Wilson, and the other man. A second later, a gray passenger car, described by Detective Carley as a Pontiac G6, drove east (*i.e.*, to the left in the video) on Fairchild Street and pulled into the parking lot of Netta's convenience store, where it stopped. Apparently, the defendant noticed the gray car, for he immediately walked across Fairchild Street to Netta's parking lot and got into the car through the front passenger door. Five seconds later, the car drove off the parking lot and headed east (left) on Fairchild Street. Nobody inside the gray car was visible on video. This clip lasted exactly one minute, ending at 12:34:32 p.m.

¶ 31    A video clip starting at 1:37:51 p.m. was recorded by a camera positioned on a building in the northwestern part of Fair Oaks and pointing to the northwest. The clip showed a long stretch of Fowler Avenue, the north-south street that forms the western boundary of Fair Oaks. According to Detective Carley, this clip included the first glimpse of Roosevelt Anderson on the Fair Oaks surveillance-camera system. The clip showed the defendant walking south on Fowler Street near its intersection with English Street, a bit north of the Fair Oaks complex. A gray Pontiac G6, traveling south on Fowler Avenue, pulled up next to Anderson, and Anderson stopped for the gray car. Anderson and the gray car were paused near one another for approximately 15 seconds— from approximately 1:38:10 p.m. to approximately 1:38:25 p.m. Afterward, the car continued its southbound drive, and Anderson continued his southbound walk. The car drove out of camera range at 1:38:36 p.m. Anderson walked out of camera range at approximately 1:39:06 p.m. This clip ended at 1:39:35 p.m.

10

¶ 32    Two short video clips—one starting at 1:38:38 p.m., and the other ending at 1:39:02 p.m.—showed a gray car moving south on Fowler Avenue. (Nobody inside the car was visible in the video.) Detective Carley testified that this gray car was the same gray Pontiac G6 that had recently stopped near Anderson on Fowler Avenue, and that the defendant had entered Netta's parking lot, a little more than one hour earlier. At the intersection of Fowler Avenue and Fairchild Street, the gray car slowed, then turned left (*i.e.*, east) onto Fairchild Street, at approximately 1:38:58 p.m.

¶ 33    A video clip starting at 1:38:53 p.m. showed again that portion of Fairchild Street at its intersection with Redden Lane (to the east, or left in the video), with Netta's convenience store on the other side of the street. At the start of that video, a burgundy-colored passenger car was stopped on Fairchild Street, in the east-bound lane, just next to Netta's parking lot. The defendant was at the driver's door, but he soon entered the burgundy car through the rear door on the driver's side. (In this clip and in all subsequent clips, the defendant was wearing white shoes. In previous clips, he had been wearing dark shoes. Otherwise, his clothing—a black hoodie and black jeans—remained the same.) The burgundy car took off and immediately turned to its left (*i.e.*, north) onto Redden Court. As the burgundy car departed the east-bound lane of Fairchild Street, for its turn onto Redden Court, a gray car drove east (*i.e.*, to the left in the video) on Fairchild Street and onto the parking lot of Netta's. The gray car appeared on Fairchild Street at about 1:39:04 p.m. According to Detective Carley, it was the same gray Pontiac G6 seen in previous videos. The driver's door of the gray car opened, but nobody exited. Again, nobody inside the car was visible on video. A small group of people standing on Fairchild Street, on the Fair Oaks side, had been largely obscured by trees. Then, one member of this group, Tariq Wilson, stepped out from the trees and appeared to talk with the gray car's driver, across the street. Tariq Wilson, Denzel Aldridge, and Tavares Mitchell then walked away from the small group they were with, and the

11

three began to walk west (*i.e.*, to the right) on Fairchild Street, toward Hubbard Lane, as the gray car drove off Netta's lot and appeared to turn around and head west on Fairchild Street. The pace of the action picks up at this point. This video lasted 50 seconds, ending at 1:39:43.

¶ 34 A video clip starting at 1:39:46 p.m. was taken by a camera on Hubbard Lane, pointing south onto Fairchild Street. Hubbard Lane is a very narrow street, entirely within the Fair Oaks property. Hubbard Lane is one (short) block east of Fowler Avenue; Redden Court is one block east of Hubbard Lane. Tariq Wilson, Denzel Aldridge, and Tavares Mitchell are seen on this video less than five seconds after they left their small group on Fairchild Street and began to walk west. First, Wilson was seen running west on Fairchild Street. Then, about four seconds into the clip— *i.e.*, at about 1:39:50—Aldridge is seen walking west on Fairchild Street and turning north (right) onto Hubbard Lane. At 1:39:54 p.m., Aldridge starts running northbound on Hubbard Lane. Finally, Tavares Mitchell was seen walking west on Fairchild Street, but as he crossed Hubbard Lane, he began to run.

¶ 35 In a clip starting at 1:39:52 p.m., and lasting just about 25 seconds, Tariq Wilson is first seen walking west on Fairchild Street, toward Fowler Avenue. A gray car—the same gray Pontiac G6 that appeared in other clips, according to Detective Carley—is driving west on Fairchild, at approximately Wilson's speed. When Wilson reaches the intersection with Fowler Avenue, he turns north (right) onto Fowler, and the gray car does likewise. After the turn, Wilson begins to run up Fowler Avenue. Three seconds after Wilson is out of sight, Tavares Mitchell is seen running west on Fairchild Street. At the intersection with Fowler Avenue, he stopped and looked north, where Wilson had run. A second later, he turned around and walked east on Fairchild Street. This video clip ended at 1:40:18.

12

¶ 36    The clip starting at 1:40:18 p.m. was taken by the camera positioned in Hubbard Lane and pointing south onto Fairchild Street. It showed Tavares Mitchell walking east on Fairchild Street and crossing Hubbard Lane. However, Mitchell then stops, looks north, up Hubbard Lane, and begins to walk north on Hubbard, apparently waving or pointing at someone for just a moment. This clip ended at 1:40:46.

¶ 37    A clip starting at 1:39:21 p.m. showed the block-long rectangular parking lot between Hubbard Lane (to the west) and Redden Court (to the east). The parking lot was a half-block north of Fairchild Street. The camera was positioned south of the parking lot, and it pointed northwest. The clip began with a view of the back end of the apartment building at Hubbard Lane—*i.e.*, the apartments with front doors and addresses on Fowler Avenue, but with their back doors on Hubbard Lane—and two rows of apartment building, between Hubbard Lane and Redden Court, which faced one another at a distance and formed a courtyard, covered in grass with numerous trees. Near the start of this clip, a burgundy-colored passenger car drove west across the parking lot, from Redden Court toward Hubbard Lane, and stopped near the row of apartments at Hubbard Lane. Detective Carley described it as the same burgundy car that the defendant had entered through a rear door near the beginning of the video that started at 1:38:53 p.m. (So, the burgundy car on Fairchild Street had turned left onto Redden Court, proceeded north on Redden Court, and crossed the parking lot in approximately 15 seconds.) A young man got out of the front passenger seat of the burgundy car and ran south toward the camera, out of the camera's range. About 37 seconds into the video—or at about 1:39:58 p.m.—Denzel Aldridge was seen running north on Hubbard Lane. He ran to the back door of an apartment, and he entered the apartment through that back door at approximately 1:40:05 p.m. Detective Carley testified that that apartment's address was 911 Fowler Avenue. Approximately six seconds later, Tariq Wilson was seen running from

13

the west (*i.e.*, away from Fowler Avenue) along the south end of the apartment building, where he turned north (*i.e.*, to his left) onto Hubbard Lane.  He entered that same apartment through the same back door.  That clip ended at 1:40:21 p.m.

¶ 38    A camera positioned on Hubbard Lane gave a much closer view of Aldridge and Wilson as they entered the apartment at 911 Fowler Avenue through the back door.  In a clip starting at 1:39:58 p.m., Aldridge was seen running north on Hubbard Lane and then entering the back door of the apartment at approximately 1:40:05 p.m.  Several seconds later, Wilson entered the same apartment.  In addition, this clip showed Aldridge and Wilson as they departed from the apartment, approximately 30 seconds after Wilson had entered it.  In other words, Aldridge and Wilson exited the apartment at approximately 1:40:40 p.m., walking out the back door and walking southbound on Hubbard Lane.  Aldridge continued to wear his distinctive white hoodie, along with black pants, black shorts, and white shoes, and Wilson wore his same black hoodie and faded blue jeans.  This video ended at 1:40:50 p.m.

¶ 39    At 1:39:39 p.m., another clip showed the alleged victim, Roosevelt Anderson, as he walked southbound on Fowler Avenue, the western boundary of Fair Oaks.  Anderson is walking past the northern part of Fair Oaks.  He is dressed all in black, including a black hat.  He has a distinctive stride, with arms swinging.  When Anderson reaches the intersection of Fowler Avenue and Clyman Lane, he turns east (*i.e.*, left) onto Clyman Lane.  Thus, Anderson enters the Fair Oaks property through Clyman Lane, on the property's north side.  As Anderson approached Clyman Lane, and as he turned east onto it, a gray car headed north on Fowler Avenue and passed him.  Detective Carley testified that it was the same gray Pontiac G6 observed in other video clips.  The gray car passed Anderson at approximately 1:40:16 p.m.

14

¶ 40    A clip starting at 1:40:21 p.m. again showed the block-long parking lot between Hubbard Lane (to the west) and Redden Court (to the east), a little north of Fairchild Street. It, too, was recorded by a camera positioned south of the lot, facing northwest. The burgundy-colored passenger car remained stopped at Hubbard Lane, facing Hubbard Lane. Two seconds later, the car starts to back up and heads into a parking space on the southwest side of the lot. Just after the burgundy car is parked—which is to say, at 1:40:40 p.m.—Denzel Aldridge and Tariq Wilson are seen walking out the back door of the apartment they had entered and heading south on Hubbard Street. After walking approximately 40 feet to the end of the apartment building, they (more or less) stop in the grassy area to the south of the building. After a few seconds, Aldridge and Wilson are joined by Tavares Mitchell. At approximately 1:41:14 p.m., Wilson, Mitchell, and Aldridge start running eastward across the middle of the parking lot (*i.e.*, from Hubbard Lane toward Redden Court). They ran past the burgundy car, to their right. Wilson turned around for a couple of seconds, facing in the direction of the car, while continuing to run eastward. Then, they slow to a walk a bit more than halfway through the lot. As those three slowed to a walk, the defendant reappeared when he got out of the burgundy car, using the driver's side rear door—at approximately 1:41:23 p.m.—and ran eastward after Wilson, Mitchell, and Aldridge. This clip ended at 1:41:30 p.m.

¶ 41    At approximately 1:40:42 p.m., a video showed Roosevelt Anderson striding eastward across a playground on the Fair Oaks property. The playground was situated between Hubbard Lane (to the west) and Redden Court (to the east), and was just a little south of Clyman Lane, the route that Anderson had used to enter Fair Oaks property. Anderson was dressed all in black, including a black hat with his black hood up.

¶ 42    A video clip starting at 1:41:18 p.m. was recorded on a camera positioned to the north of the Hubbard Lane—Redden Court parking lot, facing south.  In that clip, Wilson, Mitchell, Aldridge, and the defendant completed their eastward walk-run across the parking lot (moving from right to left in the video).  By the end, they were all walking eastbound (*i.e.*, to the left).  Mitchell was the first to cross Redden Court, a very narrow street.  The other three men—Wilson, Aldridge, and the defendant—were walking side-by-side as they crossed Redden Court.  This clip ended at 1:41:40 p.m.

¶ 43    A clip starting at 1:41:28 p.m. showed the four men as they continued their eastbound walk (from right to left, in the video).  The camera that recorded this clip was positioned to show the southern part of Redden Court, Redden Court's intersection with Fairchild Street (approximately one-half block to the south), and Netta's convenience store and parking lot beyond Fairchild Street to the south.  With Tavares Mitchell leading the way, and the other three men—Wilson, Aldridge, and the defendant—walking side-by-side, a few feet behind Mitchell, they all crossed Redden Court.  Then they passed by the narrow end of an apartment building.  (By examining one of the maps of Fair Oaks that were admitted into evidence, it becomes clear that the men, at this point, were actually walking through the rather-narrow-and-short space between two different apartment buildings.)  Then, the defendant raised his arm and pointed toward the south, toward Fairchild Street; Wilson walked back toward Redden Court and looked south for a moment, but then continued eastward with the other men.  This clip lasted only 22 seconds, ending at 1:41:50 p.m.  This clip provided the last (good) look at Tariq Wilson on video.  Each of the other three men— the defendant, Denzel Aldridge, and Tavares Mitchell—clearly appears in subsequent videos, but Wilson does not.

16

¶ 44   Reference to a map of Fair Oaks, admitted into evidence, also makes clear that after walking through the rather-narrow-and-short space between two apartment buildings, one enters into the southwestern portion of a rectangular courtyard that stretches approximately 2½ blocks north-to-south, and is approximately half-a-block wide.  This courtyard is formed by apartment buildings that face one another.  The courtyard is between Redden Court (to the west) and Lewis Lane (to the east), and between Fairchild Street (to the south) and Clyman Lane (to the north).  A sidewalk runs down the middle of the courtyard, north to south.  A surveillance camera was located in the southeastern portion of the courtyard, and it pointed to the northwest.

¶ 45   A video clip starting at 1:41:12 p.m. showed this courtyard.  That is, it showed most of this courtyard, which was covered in grass with only one tree visible.  The space between apartment buildings, which one could use to enter this courtyard at the southwest, was not in the camera's range.  Approximately 25 seconds into this video—that is, at about 1:41:37 p.m.—Roosevelt Anderson can be glimpsed in the northwestern part of the courtyard, as he walked in a southeasterly direction, across the grass.  Eventually, he made his way onto the sidewalk that ran down the middle of the courtyard, and he strode southward, swinging his arms.  At 1:41:57 p.m., with Anderson still walking south on the sidewalk, the defendant appeared, walking northward on that same sidewalk.  A second or two after the defendant appeared on the video, Denzel Aldridge appeared.  Aldridge, too, was walking north, but he was far to the left of the defendant, staying close to the apartment building that helped to delimit the left (*i.e.*, west) side of the courtyard.  Seven or eight seconds after the defendant appeared (on video) in the courtyard, Tavares Mitchell appeared; he was walking north on the same sidewalk that the defendant was walking on, but about 30 feet behind him.  They headed toward Anderson, who continued southbound on that sidewalk.

17

¶ 46    When the defendant, walking north on the sidewalk, and Anderson, walking south on it, were approximately eight feet apart, the defendant stopped.  That happened at approximately 1:42:12 p.m.  Anderson continued striding to the south, briefly raising both forearms to a position parallel to the ground, in an apparent gesture.  Anderson continued his walk south, as the defendant turned toward the south and followed him.  Mitchell continued walking north on the sidewalk and eventually passed the defendant and Anderson.  After passing them, he turned and walked a bit to his left (*i.e.*, west).  Shortly after Mitchell passed the defendant and Anderson, Anderson was a few feet ahead of the defendant.  Anderson briefly turned toward the defendant, who was continuing to follow him, and he briefly pointed either toward the defendant or simply to the north. Then, Anderson stepped off the sidewalk and walked in a southeasterly direction.  The defendant, who was a few feet behind Anderson, walked south.  The defendant and Anderson walked out of camera range at approximately 1:42:34 p.m.  In the seconds that followed, Aldridge and Mitchell regrouped in the courtyard.  They were joined by a man whom Detective Carley identified as Micah Hatcher.  Hatcher walked from an apartment building that helped to delimit the right (*i.e.*, east) side of the courtyard.  Hatcher wore a lighter-gray hoodie and very faded blue jeans. Aldridge, Mitchell, and Hatcher walked to the south.  In the final seconds of the video, Mitchell continued southward; Aldridge and Hatcher headed southwest, just as Anderson had done moments earlier.  Just before they went off camera, Aldridge began to run.  Two to three seconds later, this video ended at 1:42:55 p.m.

¶ 47    All five men—Roosevelt Anderson, the defendant, Denzel Aldridge, Micah Hatcher, and Tavares Mitchell—exited the large, rectangular courtyard at its southeast, by walking on a walkway that ran between the small space between two apartment buildings. The space between these two apartment buildings was, in large part, not subject to video surveillance; the space

18

amounted to a blind spot in the Fair Oaks's video surveillance system. The system did not show the men as they entered into the space. However, as the five men were emerging from this space, the videorecording of them resumed.

¶ 48 The video clip starting at 1:42:55 p.m. shows the denouement of this story. It was recorded on a camera that was positioned on Lewis Lane, approximately one-half block north of Fairchild Street. The camera was facing north, and slightly west. The clip showed Lewis Lane as little more than a north-south alleyway. The events shown in this clip occurred on or about Lewis Lane, less than one block north of Fairchild Street. Two seconds into this clip, Roosevelt Anderson and Denzel Aldridge begin to appear. They are on their feet, close together, and moving slowly out of the unsurveilled space between the two buildings. Anderson and Aldridge were moving to the east (that is, from left to right in the video). Anderson has his left hand at his own midsection, and Aldridge has his left hand at Anderson's midsection. Each man's right hand was free. They took another step or two eastward and were then completely past the two buildings, out in the open. Both men were then using both their hands in an apparent struggle over some item at Anderson's midsection. A couple of steps behind Anderson and Aldridge, Micah Hatcher appeared, emerging from the unsurveilled space between the two buildings. Hatcher got behind Anderson and Aldridge and joined the struggle. A second later, the defendant appeared (also from the unsurveilled space), and he also joined the struggle. As Anderson, Aldridge, Hatcher, and the defendant were all in a tight circle, Tavares Mitchell appeared from the unsurveilled space. He walked up to the four men, observed them as they struggled, and then walked west, back to the unsurveilled space. (Mitchell was not seen clearly again in video.) As the four men continued to grapple in a circle, their focus seemed to be on something at Anderson's midsection. They took a

19

couple of steps to the west, toward the unsurveilled space between the two buildings, and their struggle became more intense.

¶ 49 At 1:43:43 p.m., Aldridge stepped away from the other men and pointed a handgun toward them, but for only a second. He then lowered the gun. The three continued their struggle, with Anderson in the middle, the defendant on Anderson's right, and Hatcher on Anderson's left. Aldridge returned to this group and tried to pull on Anderson's right arm. By this point, the men were on the western edge of Lewis Lane, a very narrow north-south street. Hatcher took seven wild swings at Anderson. Then, Hatcher stepped away from the three remaining men, heading west (left, in the video) until he was standing near the space between the two buildings, where he watched events transpire. In the middle of Lewis Lane, the defendant, Anderson, and Aldridge continued their struggle. The defendant and Anderson were crouched down, struggling face-to-face, as Aldridge stood behind the defendant and reached over him, repeatedly striking Anderson over the head with the gun. The men move slightly south on Lewis Lane as Aldridge struck Anderson. Then, Aldridge, while holding the gun very near the defendant's left ear, fired the gun point-blank at Anderson's head. The shooting occurred at 1:44:05 p.m.

¶ 50 Anderson instantly fell into the middle of Lewis Lane, on his back. The defendant tumbled on top of him. As a result, the defendant seemed to lose his cell phone; it fell not far from Anderson's head. The defendant started to get up, off of Anderson, but as he arose, he took a handgun from Anderson's midsection. The defendant stood up. Hatcher, Aldridge, and the defendant immediately started to run away from Anderson's motionless body. They ran through the same unsurveilled space between two buildings that they had used to reach Lewis Lane from the large, grassy courtyard. This video clip ended at 1:44:13 p.m.

¶ 51　In a video clip that started at 1:44:03 p.m., the view was of Redden Court, looking south toward Fairchild Street, which was about a half-block from the camera. The defendant was seen at approximately 1:44:25 p.m., as he walked westbound (*i.e.*, from left to right, in the video) toward Redden Court. He then crossed Redden Court and continued walking westbound on the sidewalk that bordered the southern end of the Hubbard Lane—Redden Court parking lot. As the defendant approached and crossed Redden Court, a few people are seen running westbound (left to right) on Fairchild Street. (Among them could have been Tariq Wilson, in a black hoodie and faded blue jeans, Tavares Mitchell, in his knee-length black jacket, and Micah Hatcher, in his gray hoodie and very faded blue jeans, though nobody at trial was asked about this aspect of the video.) This clip ended at 1:44:40 p.m.

¶ 52　A clip starting at 1:44:22 p.m. shows the same block-long parking lot that was seen in two previous video clips. The parking lot is between Hubbard Lane (to the west) and Redden Court (to the east). The clip was recorded by a camera just to the south of the parking lot, pointing northwest. The courtyard with multiple trees is immediately north of the parking lot, and to the west of that courtyard is Hubbard Lane, which has on its western side the back of an apartment building that includes 911 Fowler Avenue. (Fowler Avenue is one short block west of Hubbard Lane.) A burgundy-colored car, apparently the same one that the defendant had exited at 1:41:23 p.m.—which was just three minutes earlier—remained in the parking space on the southwest side of the lot. One second into that clip—that is, at 1:44:23—Denzel Aldridge was seen running across the parking lot from the east to the west (that is, from right to left, in the video). He was wearing his distinctive white hoodie. He ran to the burgundy car for a moment, without stopping, and then proceeded running westward to the apartment at 911 Fowler Avenue, which he entered through the back door on Hubbard Lane. Aldridge entered the apartment at about 1:44:39 p.m. About

21

three seconds later, the defendant approached a silver car with a sunroof, which was parked in a space on the south side of the lot. He got into the car, through the front passenger door, at approximately 1:44:46 p.m. For several seconds, the car remained parked. Then at 1:45:10 p.m., the silver car backed up, headed west across the parking lot, and then turned right (*i.e.*, north) onto Hubbard Lane, where it drove out of sight at approximately 1:45:31 p.m. While the silver car was in motion across the parking lot and on Hubbard Lane, a man who resembled Micah Hatcher, with his gray jacket and very faded blue jeans, walked north on Hubbard Lane, from the direction of Fairchild Street, and crossed the parking lot at its western edge, then walked onto the courtyard that is to the north of the parking lot. However, nobody at trial was questioned about this man. This clip ended at 1:45:32 p.m.

¶ 53    A clip beginning at 2:18:31 p.m. showed the same block-long parking lot, recorded by the same northwest-facing camera, as the last video. Two Danville police detectives, Phillip Wilson and Chelsey Miller, were standing on the driver's side of a red SUV that was parked, front-side-in, on the southern end of the parking lot. The detectives were looking over the SUV, toward the northwest, in the direction of Hubbard Lane and the apartment building that had back doors opening onto Hubbard Lane. A uniformed Danville patrol officer stood north of the parking lot, on the southwestern edge of the courtyard; he was facing west, toward Hubbard Lane and that same apartment building. At the start of the video, Detective Miller raised an arm over the SUV, pointing toward the apartment building on Hubbard Street. At approximately 2:18:45 p.m., a tall, thin black man, whom Detective Carley identifies as Denzel Aldridge, stepped out of the back door of the apartment at 911 Fowler Avenue and stepped onto Hubbard Lane. Aldridge was not wearing his distinctive white hoodie; he wore a two-tone, long-sleeve shirt or jacket, with black jeans and white gym shoes. He continued walking the very short distance to the western edge of

22

the parking lot, where he talked with a woman. Then, Aldridge and the woman walked off to the southwest, out of view. Detective Miller raised her arm again, apparently pointing toward Aldridge and the woman. This clip ended at 2:19:11 p.m.

¶ 54            Trial: The State's Case in Chief: Additional Live Witnesses

¶ 55    Phillip Wilson, another Danville police detective, testified that during the afternoon of April 24, 2019, he heard a 911 dispatcher announce a shooting at Fair Oaks. He responded immediately, along with Detective Miller. Upon their arrival at Fair Oaks, a man later identified as Roosevelt Anderson was lying in a roadway. The detectives started looking for witnesses. A police officer was looking at surveillance video taken at Fair Oaks, and he reported that "the suspect" had entered the apartment at 909 Fowler Avenue. They set up a perimeter and watched that apartment. Nobody came out of the apartment at 909 Fowler Avenue. However, a tall, thin, black man—identified as Denzel Aldridge—came out of the apartment at 911 Fowler Avenue. The officer viewing surveillance video had misstated the address. (This information apparently was the basis for the search warrant that was executed at 911 Fowler Avenue, two hours after the shooting. See *supra*.) As Detective Wilson continued his investigation into Anderson's shooting, he determined that he wanted to speak with the defendant. Later, the defendant was taken into custody on a warrant in an unrelated case.

¶ 56    Detective Wilson further testified that he and Detective Miller interrogated the defendant at the county jail on May 11, 2019. The interrogation was audio-and-video-recorded. Prior to the interrogation, the interrogators had viewed key portions of the surveillance videotape from Fair Oaks, but the defendant had not viewed them. The recording of the interrogation was admitted into evidence and published to the court.

23

¶ 57    During the police interrogation, the defendant, age 26, said that his address was in a municipality outside Chicago, but when in Danville, he stayed with his girlfriend. In regard to the shooting of Roosevelt Anderson, the defendant seemed unsurprised that his cell phone had been found near Anderson's body. "I knew that was coming," he said. Detective Wilson asked, "So … so what happened? I mean what caused all that to start?" The defendant answered, "Honestly, I don't know, ya feel me. I told you I been left … feel me … I gave my phone to Denzel … ya feel me … I been left out. I just … I don't know … I don't know. I honestly don't know." (Throughout the interrogation, the defendant referred to Denzel Aldridge by his first name or by a nickname, "Chief D.")

¶ 58    The police interrogators stated specifically that they had seen surveillance video of the defendant exiting a car and meeting with others in a courtyard and had seen subsequent video of the defendant as part of group fighting, but that they wondered what had happened between those two scenes. The defendant replied, "I'm not the one doin' none of that." One of the police interrogators stated, "You fought him." The defendant replied, "Naw." When asked to confirm that he was denying participation in a fight, the defendant replied, "I really don't know what the situation was." When asked to confirm that he did not know what had started the fight, the defendant replied, "I don't know none of that." The interrogators asked whether Anderson had "threaten[ed] you guys." The defendant stuttered for a moment, then answered, "they literally called me over there." Apparently, the defendant was referring to the men who would become involved in the fight. The interrogators asked specifically about a videotaped scene in which "you get out of the car and they're running, and you just start running with them." To this, the defendant replied, "Yes, cuz I's trying to see what's the fuck happening, bro."

24

¶ 59    At that point, the interrogators asked about what had happened in the space that amounted to a blind spot in the Fair Oaks's video surveillance system. "They just started tussling," the defendant replied. "I wanna say Denzel started it, though. But I didn't, ya feel me, my mind was somewhere else." Eventually, the defendant said, "Somebody shot him. Denzel shot him." Detective Wilson asked, "So you just, basically those are your friends that were fighting so you were just fighting?" The defendant answered, "Yeah. That's it that's all." The defendant seemed to say that Denzel Aldridge was wrong to shoot Anderson. "That was uncalled for," he said, and he repeatedly described Aldridge's shooting of Anderson as "bogus." The interrogators expressed amazement over how close the defendant was to the gun when it was fired at Anderson. Detective Miller said, "You were still fighting with him when that gun went off." The defendant replied, "That's why I'm literally clueless about what happened."

¶ 60    After a break, the police interrogators showed the defendant photographs and asked him to identify the people depicted in them. He identified one person as "Chief D," the shooter. He identified a second person as Tariq Wilson or Wallace and confirmed that his nickname was "Shorty Ri." Finally, he identified a third person as Tavares Mitchell. According to the defendant, Tariq Wilson and Tavares Mitchell were merely fighting. "All of us was just fighting," with the exception of Aldridge, the defendant said. When asked whether he had pulled something from Anderson, the defendant answered that he had pulled from Anderson "his weapon that he was going to use." He described the weapon as "some metal" and "like a crowbars [*sic*]." The interrogation of the defendant ended.

¶ 61                    Trial: The Defendant's Case in Chief

¶ 62    For the defense, Dawn Hartshorn, a Danville police detective, testified that she participated in the Roosevelt Anderson death investigation. As part of that investigation, Hartshorn

25

interviewed Jessica Driver, who was Anderson's girlfriend. Driver told Hartshorn that Anderson carried "a gun" for "protection." Driver did not know what kind of gun it was, though; she had never seen it.

¶ 63     Tavares Mitchell testified that he recalled the day Roosevelt Anderson was shot. He had never met Anderson, and he never had heard of him, but after the shooting, he learned who Anderson was. Mitchell was at Fair Oaks on the day of the shooting. While watching Fair Oaks surveillance video of himself, Mitchell stated that he was walking north on a sidewalk in a courtyard of Fair Oaks. The defendant also was walking north on that sidewalk, ahead of Mitchell, and Denzel Aldridge was walking to Mitchell's left. Meanwhile, Anderson was walking on that same sidewalk, southbound, directly toward the defendant and Mitchell as they walked north. As Mitchell and Anderson walked past each other, Mitchell saw that Anderson had "an extended magazine," *i.e.*, "a clip," sticking out of the pocket of his hoodie. He could not see an actual gun, or even the handle of a gun, because Anderson "had his hand over it."

¶ 64     Mitchell further testified that he walked toward Aldridge, and he and Aldridge were joined by a man whom Mitchell did not know. At the same time, the defendant and Anderson talked and walked south toward Fairchild Street. The defendant and Anderson walked into the area between two buildings, while Mitchell was behind them, still in the courtyard. The defendant and Anderson were out of Mitchell's sight. Then, Mitchell heard the defendant yell "help." He was familiar with the defendant's voice, for he had bought "weed" from him on a few occasions. Mitchell continued walking, wanting to see what was happening. He soon saw the defendant and Anderson standing between the two buildings, with the defendant holding Anderson's hands. Aldridge and the other man (*i.e.*, the man unknown to Mitchell) went over to help the defendant, "so then they [*sic*] fighting." Mitchell himself walked over to where the four men were tussling. He saw that

26

Anderson was holding "a gun" that was halfway out of his pocket; it had the same clip that Mitchell had seen previously. Meanwhile, the defendant was using his own hands to hold Anderson's hands. When Mitchell saw the gun in Anderson's possession, he "left." He never saw the defendant hit or kick Anderson.

¶ 65    On cross-examination by the State, Mitchell admitted being in the company of the defendant, Denzel Aldridge, and Tariq Wilson, among others, earlier that day on Fairchild Street. He admitted that during his own trial in August 2020, he did not say anything about seeing "a clip" sticking out of the pocket of Roosevelt Anderson's hoodie but explained that his attorney did not ask him about it. Also, he admitted to testifying during his own trial that he was unsure whether it was Anderson or the defendant who had yelled "help" from between the two buildings in Fair Oaks. Mitchell did not speak with the police on the day Anderson was shot. Even after his friend Denzel Aldridge was arrested for the murder of Anderson, Mitchell did not speak with the police.

¶ 66    The defendant, age 28 and a high-school graduate, testified in his own defense. On April 24, 2019, the defendant was living at Fair Oaks. However, he was "barred" from Fair Oaks, and the police would have taken him "to jail" if they ever found him on the premises. The defendant did not know Denzel Aldridge, by name or by nickname, though he had seen him around. The defendant did not know Tavares Mitchell on April 24, though he had seen him around, and he did know his nickname. He did not know Tariq Wilson on April 24. Subsequent to April 24, however, the defendant did learn the identities of those three men. The defendant also did not know Roosevelt Anderson and was completely unfamiliar with him. After April 24, the defendant learned who Anderson was.

¶ 67    The defendant further testified that on April 24, 2019, at approximately 1:30 p.m., the defendant was at Fair Oaks, "[m]oving around selling weed." The defendant watched a video of

27

himself on that date at approximately 1:38 p.m., when he was on Fairchild Street, at Netta's convenience store, and got into his friend Jada's burgundy car. The defendant did not tell anyone else on Fairchild Street where he was going, but he asked Jada to take him to Casey's convenience store, where the cigarettes were much cheaper than at Netta's. Jada drove into the interior of Fair Oaks and drove onto "the parking lot behind Fairchild." There, one of Jada's friends got out of the car and ran to fetch his ID. The defendant waited in Jada's car, still intending to go to Casey's. Jada parked her car.

¶ 68    Then, the defendant observed Tariq Wilson, Tavares Mitchell, and Denzel Aldridge as they ran through the parking lot, past the rear of Jada's car. The defendant did not know where these three men were headed. However, the defendant immediately got out of Jada's car and pursued the three, for he wanted to try to "sell some weed" to them. The three men were still in the parking lot, headed toward the courtyard, when the defendant caught up with them. When he caught up, he asked them whether they wanted to purchase marijuana. The three men did not answer. To the defendant, the three seemed uninterested in buying marijuana. The defendant decided to go home, to Wakely Drive, which is within the Fair Oaks complex (to the east). He did not tell the other three men that he intended to go home, and the three did not tell him what they were doing.

¶ 69    In order to reach his home on Wakely Drive, the defendant needed to walk north. He headed north through the courtyard. Watching a video of himself walking northbound through the courtyard, the defendant identified Tavares Mitchell, who was walking several feet behind him, and Denzel Aldridge, who was walking considerably to his left. The defendant also identified Roosevelt Anderson, who was walking toward him, *i.e.*, walking southbound. As the defendant reached Anderson, he asked Anderson whether he wanted to buy some weed. "[Anderson] start asking me questions, like, who I'm is [*sic*], who I hang with, who my peoples [*sic*] is. Just rambling

28

questions." The defendant responded that he was "new down here" and that he was "the weed man." By this time, the defendant had already stopped, turned around, and was walking southbound along with Roosevelt, "[b]ecause me and Roosevelt was actually talking" about "[t]he questions that he was asking me." Tavares Mitchell, continuing to walk northbound on the sidewalk, passed both the defendant and Anderson. At that point, Anderson looked "agitated and angry" as he told the defendant, while "scowling," that "you don't want no problems." The defendant "kept moving" and "left him alone," while checking messages on his phone. Anderson continued walking toward the southeast, where there was a walkway between two buildings. Meanwhile, the defendant walked "[t]owards Fairchild," the street to the south. At that point, the two men dropped out of the surveillance camera's range.

¶ 70 The following events were not recorded by video-surveillance cameras. The defendant testified that he continued to walk south. The defendant saw that Anderson had stopped walking, and he heard Anderson say to the defendant, "Hey, dude, check it out." Anderson was approximately 10 to 15 feet from the defendant at that time. Figuring that Anderson had decided to purchase marijuana from him after all, the defendant walked until he was only one or two feet from Anderson. However, Anderson did not say anything to the defendant at that time. Instead, Anderson "squared up" to the defendant, *i.e.*, he "fixed his whole posture" toward the defendant, and with a face expressing anger, he "started fumbling for something in his [hoodie] pocket." The defendant could see that Anderson was attempting to pull out a gun. He had not previously seen a gun in Anderson's possession. The defendant had not threatened Anderson or made any threatening gestures. The defendant felt "[s]cared" and thought that Anderson was "fitting to shoot [him]." Using both of his hands, the defendant grabbed both of Anderson's hands, in order to stop him from pulling out the gun. Anderson said to the defendant, "Let me go. Let me go. I'm fitting

29

to shoot you." The defendant did not say anything to Anderson, or punch or kick Anderson, but he "started yelling for help." In answer to the defendant's call for help, Denzel Aldridge arrived. While the defendant still had his hands on Anderson's hands, Aldridge "grabbed" Anderson. At about that same time, the defendant "just lost [his] grip" on Anderson, in part because the defendant was still holding his cell phone. At this point, the video recording of events resumed.

¶ 71 The defendant further testified that Aldridge continued "tussling" with Anderson as they emerged from the unsurveilled space between the two apartment buildings. Micah Hatcher, whom the defendant did not know at the time, and the defendant followed Aldridge and Anderson into camera range. At that point, the defendant wanted to help the people who had come to his aid. He "started tussling" some more with Anderson. Aldridge stepped away from the group and pointed a gun toward the defendant. The defendant had been unaware that Aldridge was armed. The defendant looked at Aldridge's gun, but he maintained his primary focus on Anderson's gun. He again placed his hands on Anderson, fearing for his life. Micah Hatcher "[w]alk[ed] off." Then, the defendant "heard a loud pop" very close to his left ear. Anderson and the defendant fell to the ground. The defendant did not know that Anderson had been shot in the head; he was unsure of whether Anderson had been shot at all, or how badly he was injured. Not wanting Anderson to be able to shoot him, the defendant "disarmed" Anderson. That is, he pulled a .45-caliber gun off of him. He held Anderson's gun in his hand as he "ran" away from Anderson. He "looked back" as he ran, to make sure that Anderson was not chasing him.

¶ 72 The defendant recalled speaking to Detectives Wilson and Miller. At the time of that conversation, the defendant was already aware that Denzel Aldridge had been charged with murder. He remembered telling the detectives that he had given his phone to Aldridge, but that statement was a lie; instead, he lost his phone "during this time." The defendant also remembered

30

telling the detectives that he took a crowbar or a piece of metal from Anderson, but that statement, too, was a lie. The defendant lied to the detectives because he "was scared of being charged with murder."

¶ 73    On cross-examination by the State, the defendant admitted that the three men he had seen running past Jada's car—Aldridge, Wilson, and Mitchell—were three of the same men in whose company he had been on Fairchild Street, just a couple of minutes beforehand. When the defendant caught up with the three, and asked them whether they wanted to buy marijuana, "they said they [*sic*] cool, they [*sic*] not interested, they [*sic*] all right." As for Aldridge, the defendant testified that he thought Aldridge was a hero, who had helped to save the defendant's life. Nevertheless, he did not remain at Fair Oaks to tell the police about Aldridge's heroic actions. Also, the defendant did not go home to Wakely Drive in Fair Oaks. Instead, he got into a car and asked for a ride, to someplace other than his home. The defendant admitted that he did not return to his friend Jada's car, despite the fact that he had asked Jada to drive him to Casey's. Instead, he simply decided to "skip it." During his interrogation by police detectives, the defendant admitted that he did not say anything about Roosevelt Anderson's having a gun.

¶ 74                             Trial: The State's Rebuttal

¶ 75    In rebuttal, the State produced certified copies of the defendant's Cook County convictions for burglary and felony resisting a peace officer. Detective Wilson testified that during his interrogation of the defendant, the defendant never said that Roosevelt Anderson had made any threatening statements or movements. The defendant never made reference to self-defense.

31

¶ 76                                    The Verdict

¶ 77    After hearing closing arguments, the court took the case under advisement.  On May 5,

2021, the court rendered its verdict.  It found the defendant guilty of all five counts—the four

counts of first degree murder and the one count of aggravated battery.

¶ 78                                Posttrial, Presentencing

¶ 79    On June 1, 2021, the defendant filed a *pro se* motion for new trial.  The defendant claimed

(1) that on May 13, 2019, the circuit court failed to appoint the public defender for the defendant;

(2) that trial counsel "failed to investigate or perform certain pretrial functions" and, along with

the court, failed to "fully admonish [the] defendant as to the undisclosed conflicts; (3) that the

defendant was not brought before the court at a critical stage of the proceeding; (4) that the trial

court and the state's attorney violated the statutory procedures on arraignment, thus depriving the

defendant of a fair trial; (5) that the trial court and the state's attorney failed to provide a proper

preliminary examination, thus depriving the defendant of a fair trial; (6) that trial counsel, in the

motion for substitution of judge, fabricated the claim that the defendant believed that Judge Hall

was prejudiced against him, thus depriving the defendant of a fair trial; (7) that "the concealment

of the removal of Judge Nancy Fahey claimed done on December 16, 2020," deprived him of a

fair trial; (8) that Judge Fahey's "concealment of her removal" and her "failure to admonishment

[*sic*] of the conflicts that now has [*sic*] been discoverd [*sic*]" deprived the defendant of a fair trial;

(9) that the "cumulative effect" of the foregoing errors deprived the defendant of a fair trial; and

(10) that the defendant was deprived of counsel "to advise him of his rights during the states [*sic*]

proceeding of seeking an [*sic*] bill of indictment at a critical stage."

¶ 80    On June 2, 2021, trial counsel filed on the defendant's behalf a motion for the circuit court

to conduct an inquiry into the allegations of ineffective assistance of trial counsel presented in the

defendant's *pro se* motion for new trial, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). Also on June 2, 2021, trial counsel filed on the defendant's behalf a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. He claimed, essentially, that the defendant had not been proved guilty of the crimes beyond a reasonable doubt.

¶ 81    After several delays, on March 1, 2022, the court conducted a preliminary *Krankel* inquiry into the defendant's *pro se* allegations of ineffective assistance of trial counsel. With the defendant under oath, the court asked him to elaborate on any claim that concerned ineffective assistance. First, the defendant said that he asked for the discovery in his case "multiple times," but counsel never allowed him to have it, though counsel "went over certain things" in discovery with him. Second, he provided counsel with the names and contact information of "multiple people" who could testify on his behalf, but "he did not do none of that either." Third, counsel did not inform him that he was filing a motion for substitution of judge, merely informing him that the motion already had been ruled upon. At that point, trial counsel was given an opportunity to respond to the defendant's allegations. Counsel stated that he and the defendant "went over all his discovery," including videos, which they reviewed on counsel's laptop computer. They reviewed discovery on "numerous occasions" and during "numerous telephone calls." As for not providing the defendant with his own copy of discovery, counsel stated that the defendant never asked for his own copy. In regard to potential witnesses, counsel stated that he "investigated any name that he gave me," and he tried to find witnesses who could help the defense, but after investigation, he learned that they would not be helpful. As for the motion for substitution of judge, counsel stated that he discussed the matter in advance with the defendant, who "absolutely wanted" to substitute Judge Hall. After the motion was granted, the defendant was "very pleased" that the case would

33

return to Judge Fahey's docket, counsel stated. At the end of the *Krankel* inquiry, the court found that there was no ineffective assistance of counsel.

¶ 82 On March 28, 2022, the defendant appeared with a new attorney for a hearing on a posttrial motion. The new attorney adopted the motion for new trial that the defendant's trial counsel had filed on June 2, 2021, wherein it was claimed, essentially, that the State had failed to prove the defendant guilty beyond a reasonable doubt. In his argument to the court, posttrial counsel argued that there was no evidence that the defendant was a party to any kind of agreement, or a common design, to rob or otherwise accost Roosevelt Anderson. It was uncontroverted that Denzel Aldridge, alone, had shot Anderson, counsel argued, and the defendant could not be held accountable for that shooting. In the end, the court rejected counsel's arguments. The court denied the defendant's motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial.

¶ 83                              Sentencing

¶ 84 The presentence investigation report showed that the defendant had a record of delinquency, and his prior criminal convictions included a conviction for residential burglary in 2012 and a conviction for felony resisting a peace officer in 2015. Both of these felony convictions were entered in Cook County, Illinois.

¶ 85 For sentencing, the State called Ralph Dunham, a Danville police detective. He testified that he examined reports compiled during a police investigation of a home invasion that occurred at Fair Oaks in February 2019. A man named Juan Quinn reported that a few people had burst into his apartment at Fair Oaks and had stolen hundreds of dollars in cash. One of these people was the defendant, with whom Quinn was familiar. The defendant had a handgun with an extended

34

magazine, and he pistol-whipped Quinn in the head and face. The police were summoned. They observed "knots" on the front of Quinn's face and head, and a laceration on the back of his head.

¶ 86   The defense called two witnesses in mitigation. James Flowers, the defendant's stepfather, testified that the defendant was a hard worker at Flowers's construction company, and he was an excellent father to his children. Jennifer Lacy, the defendant's older sister, testified that she missed the defendant. Lacy said their mother missed the defendant terribly, to the point where she suffered depression, which contributed to heart problems.

¶ 87   The State recommended a sentence of imprisonment for 55 years, plus restitution for Roosevelt Anderson's mother and girlfriend, for funeral expenses. Defense counsel recommended imprisonment for 35 years. No statement in allocution was given. The court found no mitigating factors. Aggravating factors included the defendant's history of delinquency and criminality, and the need to deter others from committing similar crimes. For the crime of intentional first degree murder, the court imposed a sentence of imprisonment for a term of 40 years, plus 3 years of mandatory supervised release, and ordered the defendant to pay fines, fees, and restitution. (The other counts all merged into that one count.) The court noted that its sentence was on the lower end of the 35-to-75-year sentencing range, due to the defendant's not being the actual shooter. Finally, the court admonished the defendant as to his right to appeal, and the defendant indicated his understanding.

¶ 88   A notice of appeal was filed, thus perfecting the instant appeal. OSAD was appointed to represent the defendant on appeal.

¶ 89                                    ANALYSIS

¶ 90   The defendant appeals from his conviction of intentional first degree murder. As noted previously, the defendant's appointed attorney on appeal, OSAD, has filed an *Anders* motion to

35

withdraw as counsel, along with a supporting brief. The defendant has filed an objection to OSAD's motion.

¶ 91    In his objection, the defendant states that (1) he had a conflict of interest with the public defender, but the public defender nevertheless represented him at two court appearances early in these proceedings, and (2) the State's evidence was insufficient to prove him guilty. A conflict did exist between the defendant and the public defender. However, early in the proceedings, the public defender filed a motion for the appointment of a conflicts public defender. The conflicts public defender was appointed, and from that moment on, there was no further talk or intimation of a conflict of interest. There is no indication that the public defender's office, during the brief time that it represented the defendant, somehow obtained information that somehow harmed the defendant at these proceedings. As for the alleged insufficiency of the evidence, it will be discussed *infra*.

¶ 92    In its brief filed in support of its *Anders* motion, OSAD discusses five potential issues in this appeal. This court will discuss each of the five.

¶ 93    For its first potential issue, OSAD discusses whether the State's evidence was sufficient to prove the defendant guilty of intentional first degree murder. A defendant cannot be found guilty of a crime unless he is proved guilty, beyond a reasonable doubt, of every fact necessary to constitute the crime with which he is charged. *People v. Brown*, 2013 IL 114196, ¶ 48. When the sufficiency of the evidence is challenged on appeal, a reviewing court must view all of the evidence in the light most favorable to the prosecution, and then must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The weight to be given a witness's testimony, the credibility of witnesses, the resolution of evidentiary

36

inconsistencies or conflicts, and reasonable inferences to be drawn from testimony are all the responsibility of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 94 Here, nobody disputed that Denzel Aldridge was guilty of intentional first degree murder. "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he *** intends to kill or do great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2018). On video, Aldridge was seen firing a handgun pointed at Roosevelt Anderson's head, at extremely close range. The question at the defendant's trial was whether the defendant was accountable for Aldridge's actions. A person is legally accountable for the conduct of another person when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.* § 5-2(c). To prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d 307, 338 (1995).

¶ 95 At the defendant's trial, surveillance video recordings were crucial. It is impossible to guess how the trial might have gone without those recordings, which are described in detail *supra*. Detective Carley testified that the surveillance video showed that for almost all of a 90-minute time period in the middle of the day of Anderson's shooting, the defendant, Denzel Aldridge, Tariq

37

Wilson, and Tavares Mitchell were milling about on a portion of Fairchild Street between Redden Court and Hubbard Lane. This certainly indicates that the men knew one another, to some extent.

¶ 96    The video evidence established that Roosevelt Anderson was shot in the head at 1:44 p.m. During the five minutes preceding the shooting, Fair Oaks surveillance video suggested that Aldridge, Wilson, Mitchell, and the defendant developed a keen interest in Anderson's whereabouts within Fair Oaks. Aldridge, Mitchell, and the defendant tracked Anderson to a courtyard in Fair Oaks. They entered and moved through that courtyard in a type of formation. It was in that courtyard that the defendant first accosted Anderson. When Anderson continued his walk out of the courtyard, the defendant followed him. Subsequently, Aldridge, Mitchell, and a man named Micah Hatcher regrouped, and they also followed him. It was evident that the defendant and his associates planned to overpower Anderson.

¶ 97    All of the men entered into a small space between two apartment buildings that, for the most part, was not subject to video surveillance. That is, this small area between apartment buildings amounted to a blind spot for the video-surveillance system. The men again became visible as they emerged from this space between buildings. First, Anderson and Aldridge emerged, each with his left hand at Anderson's midsection. Next, Hatcher came along, and joined in as Aldridge and Anderson struggled. Finally, the defendant joined the struggle. Tavares Mitchell also reappeared, but only for a moment, then walked back to the unsurveilled space. Aldridge, Hatcher, and the defendant seemed focused on Anderson's midsection. The four men fought in a tight circle.

¶ 98    By 1:43 p.m., the fighting had become more intense. Aldridge stepped away from the other men and pointed a gun at them, for only a second. He returned to the group. Hatcher took several wild swings at Anderson, then he stepped away. In the end, only the defendant, Aldridge, and

38

Anderson were fighting. As Anderson and the defendant struggled face-to-face, Aldridge repeatedly struck Anderson with the gun. Finally, at 1:44 p.m., Aldridge pointed the gun directly at Anderson's head and fired it. Anderson immediately collapsed into the middle of Lewis Lane. At that point, the reason for the focus on Anderson's midsection became clear, as the defendant took a handgun from that part of Anderson's motionless body. Immediately, the defendant, Aldridge, and Hatcher ran away. The defendant soon found a ride out of Fair Oaks.

¶ 99 The defendant clearly cooperated with Aldridge in the attack on Anderson, to the bitter end. As OSAD states in its *Anders* brief, "Viewing the evidence in the light most favorable to the State, there was sufficient evidence for the trier of fact to conclude that [the defendant] was accountable for Aldridge's shooting of Anderson under the common design rule."

¶ 100 Also, a rational trier of fact could have concluded that the State disproved the defendant's defense of self-defense. "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). A person is justified in using force that is intended or likely to cause death or great bodily harm "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2018). Shooting someone point-blank in the head surely constitutes force intended or likely to cause death. Therefore, the State had the burden of proving that the defendant, or rather Aldridge, did not reasonably believe that firing into Anderson's head was necessary to prevent imminent death or great bodily harm to himself or another.

¶ 101 At trial, the only evidence that Anderson posed a threat to anyone came primarily from the testimony of the defendant himself, with corroborating testimony from Tavares Mitchell.

39

However, the defendant was thoroughly impeached with his prior statements to police interrogators—statements that he made before he knew what the surveillance videotape showed. At trial, the defendant testified that Anderson looked "angry" as he told the defendant, "you don't want no problems," and that Anderson subsequently "squared up" to the defendant and attempted to pull a gun from his clothing. However, during interrogation, the defendant never mentioned self-defense, or anything related to self-defense. Indeed, when a police interrogator specifically asked about possible threats made by Anderson, the defendant changed the subject. During the interrogation, the defendant first tried to distance himself from the entire situation, saying that he did not even know what had started the fight with Anderson, or why it started. Later in the interrogation, the defendant actually seemed to fault Aldridge for Anderson's death, saying that the shooting of Anderson was "uncalled for" and "bogus." This description of the shooting was completely at odds with the defendant's trial testimony, which portrayed the shooting as necessary to prevent the imminent death of the defendant or another. As OSAD states in its brief: "Thus, in the light most favorable to the State, a rational trier of fact could find the evidence was insufficient to show that Aldridge actually and reasonably believed that he needed to shoot Anderson to defend himself, [the defendant], Hatcher, or Mitchell from Anderson."

¶ 102   In addition, portions of the defendant's in-court testimony did not make any sense or were inconsistent with the video recordings. For example, the defendant testified that after he and Anderson had walked into the small, unsurveilled space between two buildings, the defendant "squared up," with a face expressing anger, and "started fumbling" for a gun in his hoodie pocket, and the defendant responded by grabbing both of Anderson's hands with his own and "yelling for help," a cry that was answered by Denzel Aldridge. However, in a video recording, Anderson and Aldridge are seen emerging from the unsurveilled space, and Aldridge appears to be the aggressor,

40

attempting to grab at Anderson. Aldridge and Anderson are soon followed out of the unsurveilled space by Micah Hatcher and the defendant, who make the struggle a three-on-one fight against Anderson. The events that went unrecorded lasted only a few seconds. It is difficult to imagine that the scenario described by the defendant at trial could have resulted in the scenario shown on the videotape, and in so brief a time.

¶ 103   The second potential issue raised by OSAD in its brief is whether the defendant validly waived his right to a trial by jury. The defendant had a constitutional right to a jury trial. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. He also had an opportunity to waive trial by jury. The right to a trial by jury may be waived if it is "understandingly waived by defendant in open court." 725 ILCS 5/103-6 (West 2020). An "understanding" waiver is both knowing and voluntary. *People v. Tooles*, 177 Ill. 2d 462, 468 (1997). Here, the circuit court was thorough in its efforts to ensure that the defendant's jury waiver was knowing and voluntary. The court placed the defendant under oath and asked him questions aimed at determining that he was generally competent, and clear-headed on that occasion. It asked him to define a jury trial and a bench trial, which he did. Then, the court admonished him as to his rights at either type of trial, and the State's burden of proving guilt beyond a reasonable doubt, which the defendant stated he understood. The court also asked him if he understood that a waiver of jury trial would mean that the judge alone would "mak[e] the decision" in his case, and the defendant answered affirmatively. The defendant indicated that no promises had been made, or force applied, to persuade him to waive a jury trial, and that he was waiving freely and voluntarily. Finally, the defendant signed a written jury-waiver form. Only then did the court accept the defendant's jury waiver and schedule the case for a bench trial. There would be no basis for an argument that the defendant's jury waiver was not understandingly made.

41

¶ 104   The third potential issue raised by OSAD is whether any error was committed in the handling of the defendant's motion for substitution of judge.  On December 23, 2020, the defendant filed his motion for substitution of judge, as of right, under section 114-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-5(a) (West 2020)).  In that motion, the defendant claimed that Judge Hall was so prejudiced against him that he could not receive a fair trial, and he requested an automatic substitution.  "Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion."  *Id.*  At the time the motion was filed, this case had been on Judge Fahey's docket for more than a year, but due to a scheduled rotation of judicial duties, it was recently placed on Judge Hall's docket.  Judge Hall was substituted, and the case was reassigned to Judge Fahey.  From the record, it is unclear on whose order this was accomplished.  However, since the defendant received the relief that he sought—*i.e.*, the substitution of Judge Hall—there can be no meritorious argument for the defendant in regard to this issue.

¶ 105   The fourth potential issue raised by OSAD is whether the circuit court properly handled the defendant's *pro se* allegations of ineffective assistance of trial counsel, which he made shortly after the trial.  When a defendant raises a *pro se*, posttrial claim of ineffective assistance of trial counsel, the circuit court must address and resolve that claim in accordance with the procedures established by *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny.  The first step is for the court to conduct a preliminary inquiry into the factual basis for the claim.  *People v. Jolly*, 2014 IL 117142, ¶ 29.  If the court determines that the claim lacks merit, or pertains only to trial strategy, the court may deny the *pro se* motion.  *Id.*  If, on the other hand, the allegation shows possible neglect of the case, new counsel should be appointed.  *Id.*  When evaluating the ineffective-assistance claim, "some interchange" between the court and counsel is "permissible and usually

42

necessary." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). "Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Id.* Whether the circuit court properly conducted a preliminary *Krankel* inquiry presents a legal question that is subject to *de novo* review. *Jolly*, 2014 IL 117142, ¶ 28. "[T]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance of counsel." *People v. Johnson*, 159 Ill. 2d 97, 125 (1994).

¶ 106 Here, the court placed the defendant under oath and asked him to elaborate on his ineffective-assistance allegations. The defendant discussed three such items—one relating to discovery, one relating to witnesses, and one relating to a motion for substitution of judge. Afterward, the court turned to trial counsel for his response to those allegations. Counsel, essentially, refuted each and every one of them. The circuit court handled the *pro se* allegations of ineffective assistance in exactly the manner prescribed by our supreme court. Its inquiry was certainly adequate. This issue would be without merit.

¶ 107 For its fifth (and final) potential issue, OSAD raises the issue of whether any error was committed during sentencing. The sentencing court has broad discretion when fashioning a sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Sentences within the permissible statutory range may be deemed an abuse of discretion only if they are greatly at variance with the spirit or purpose of the law or they are manifestly disproportionate to the nature of the offense. *Id.* The defendant was sentenced to 40 years in prison. The sentencing range was 35 to 75 years. See 730 ILCS 5/5-4.5-20(a)(1), 5-8-1(a)(1)(d)(i) (West 2022). As the court noted, the defendant's sentence was on the lower end of this range. It certainly was not at variance with the spirit or purpose of the law, or manifestly

disproportionate to the nature of the offense. Furthermore, nothing in the record even intimates that the court considered any improper fact or factor in sentencing the defendant. This argument would have no merit.

¶ 108                                    CONCLUSION

¶ 109   This court's complete and thorough examination of the record has not revealed any issue of arguable merit in this appeal. Certainly, none of the five potential issues raised by OSAD in its *Anders* brief has any arguable merit. Accordingly, OSAD's motion for leave to withdraw is granted, and the judgment of conviction is affirmed.


¶ 110   Motion granted; judgment affirmed.